UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 21-319-01 (EGS) |
| | ) | |
| v. | ) | VIOLATION: 18 U.S.C. § 1031 |
| | ) | (Major Fraud against the United States) |
| | ) | |
| RICK CUNEFARE, | ) | |
| | ) | FILED |
| Defendant. | ) | JUN - 9 2021 |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and RICK CUNEFARE ("CUNEFARE"), with the concurrence of his attorney, Lee Stein, stipulate and agree that the following facts fairly and accurately describe CUNEFARE's conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that CUNEFARE committed the offense to which he is pleading guilty. CUNEFARE knowingly, voluntarily, and truthfully admits to the facts set forth below.

### Background

1. The Military Housing Privatization Initiative ("MHPI") was a statutorily established program designed to attract private sector financing, expertise, and innovation to provide necessary housing for military servicemembers, their families, and other dependents faster and more efficiently than traditional military construction processes would allow. Put into effect via the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (110, Stat 186, Section 2801), a goal of the MHPI was to provide military families access to safe, quality, affordable, well-maintained housing in a community where they would choose to live, while also

1

allowing them the convenience of being near military bases and other institutions consistent with their duties.

2.  Branches of the U.S. Armed Forces, including the Air Force, Army, and Navy, have used authority granted to them under the MHPI to enter into agreements with private real estate developers to develop, maintain, and operate housing for U.S. military members at military bases around the United States.

3.  Basic Allowance for Housing ("BAH") was an allowance provided to servicemembers stationed in the United States that is intended to cover housing costs in local civilian housing markets when government housing is not available. Under the MHPI, servicemembers generally used their BAH to pay rent to private developers.

4.  As part of the program, private developers received U.S. Department of Defense money intended for the benefit of servicemembers in the form of BAH.

Relevant Individuals and Entities

5.  Company 1 was a diversified real estate services company headquartered in Philadelphia, Pennsylvania.  Company 1 was a division of a publicly traded multinational real estate and construction company based in the United Kingdom.  Company 1 was one of the nation's largest providers of military family housing, developing and operating housing communities at approximately 21 Air Force bases, and approximately 34 Army and Navy bases throughout the United States. Company 1 generally developed and operated these military housing communities through a network of wholly owned subsidiaries.

6.  CUNEFARE was a citizen of the United States whose primary residence was in Phoenix, Arizona.  From approximately 2013 to 2015, CUNEFARE served as a Regional Manager for Company 1. He oversaw the military housing communities that Company 1 developed and

operated at Lackland Air Force Base ("AFB"), Travis AFB, Vandenberg AFB, Tinker AFB, and Fairchild AFB, which were Department of Defense installations. At all times relevant to the Information, and in furtherance of the scheme detailed here, CUNEFARE acted within the scope of his agency with and employment at Company 1, and to benefit himself, Company 1, and its parents, affiliates, and subsidiaries. The participants in the scheme also acted within the scope of their agency with and employment at Company 1, and to benefit, Company 1, and its parents, affiliates, and subsidiaries. Moreover, CUNEFARE admits that he participated in the scheme described herein with the full knowledge, consent, and encouragement of his superiors at Company 1.

7. CC-1 was a Regional Vice President for Company 1.

8. CC-2 was a Community Manager for Company 1.

9. CC-3 was a Facility Manager at Lackland AFB.

10. CC-4 was an Administrative assistant for Company 1.

11. CC-5 was a Community Manager for Company 1.

12. CC-6 was an Operations Manager for Company 1.

13. CC-7 was a Community Manager for Company 1.

14. CC-8 was a Community Manager for Company 1.

15. CC-9 was a Work Order Administrator at Lackland AFB.

16. CC-10 was a Work Order Administrator at Lackland AFB.

Development and Management of Privatized Military Housing Communities

17. Company 1 entered into agreements with the Air Force to develop and manage military housing communities at Air Force installations across the country, including at Lackland AFB, Travis AFB, Vandenberg AFB, Tinker AFB, and Fairchild AFB. These agreements were

generally valued at more than $1,000,000. For example, the Air Force loaned Company 1 approximately $69,500,000 in connection with the development and ongoing operation of the military housing community at Lackland AFB.

18.     Company 1 was paid fees for the various phases of development and management of each community, from design and construction, to ongoing community management and maintenance.

19.     Company 1's fee for community management and maintenance for a military housing community generally consisted of (1) a base fee, paid monthly, and (2) a discretionary performance incentive fee (the "Performance Incentive Fee"), paid quarterly.  Both fees were a percentage of the Effective Gross Rent ("EGR") that was earned by the military housing community.  The Performance Incentive Fee was in part contingent on Company 1 satisfying maintenance objectives at the military housing community ("Maintenance Performance Objectives"). In general, the Maintenance Performance Objectives were met by responding to and/or completing maintenance issues within specified timeframes (e.g. respond to an emergency water leak within 30 minutes, and complete the repair within 24 hours).

20.     From approximately 2013 to 2015, Company 1 received approximately $2.5 million in Performance Incentive Fees for satisfying the Maintenance Performance Objectives at the military housing communities overseen by CUNEFARE.

How Company 1 Tracked and Reported
Maintenance Performance Objectives to the Air Force

21.     Company 1 used a computer program called Yardi to manage maintenance issues that arose at the military housing communities that it managed.  Generally, when residents encountered a maintenance issue in their housing units, which could include anything as minor as a ripped screen or more serious such as a major water leak, they would report the issue to an on-

site management office staffed by Company 1 employees. A Company 1 Work Order Administrator would enter information about the issue into Yardi, which generated a work order that could be used to track the maintenance issue. The Work Order Administrator used Yardi to schedule the issue for repair, to be carried out by Company 1 Maintenance Technicians and contractors; track progress of the repair; and document its completion. When the work was completed, the Work Order Administrator would "close out" the work order.

22. Company 1 also used Yardi to generate Quarterly Maintenance Reports to track response and completion times for work orders to ensure that it was meeting the Maintenance Performance Objectives. Figure 1, below, is an example of a portion of the Quarterly Maintenance Report.

| Type | Total Calls | Total Responses | No. of Late Responses | % On-Time Responses | Avg Response Time (hrs) | Target Response Time (hrs) | Variance (Target - Avg.) | Total Completions | No. of Late Completions | % On-Time Completions |
|---|---|---|---|---|---|---|---|---|---|---|
| 1-Emergency | | | | .00 | .00 | .00 | .00 | | | .00 |
| Non-Warranty | 3 | 3 | | 100.00 | .28 | 1.00 | .72 | 3 | | 100.00 |
| Total 1-Emergency | 3 | 3 | | 100.00 | .28 | 1.00 | .72 | 3 | | 100.00 |
| 2-Urgent | | | | .00 | .00 | .00 | .00 | | | .00 |
| Non-Warranty | 379 | 375 | 11 | 97.07 | 1.17 | 4.00 | 2.83 | 379 | | 100.00 |
| Total 2-Urgent | 379 | 375 | 11 | 97.07 | 1.17 | 4.00 | 2.83 | 379 | | 100.00 |
| 3-Routine | | | | .00 | .00 | .00 | .00 | | | .00 |
| Routine (Standard) | 2,512 | 2,353 | 14 | 99.41 | 7.42 | 26.99 | 19.57 | 2,413 | 52 | 97.85 |
| Appointment | | | | .00 | .00 | .00 | .00 | 1 | 1 | .00 |
| Total 3-Routine | 2,512 | 2,353 | 14 | 99.41 | 7.43 | 26.99 | 19.56 | 2,414 | 53 | 97.80 |

*Figure 1*

23. Company 1 submitted a Performance Incentive Fee request letter and a summary of the Quarterly Maintenance Report to the Air Force on a quarterly basis, in order to obtain the Air Force's approval for Performance Incentive Fees. Figure 2, below, is an example of a Performance Incentive Fee request letter for the bases overseen by CUNEFARE. Company 1 generally sent Performance Incentive Fee request letters via email. When the Air Force approved Company 1's Performance Incentive Fee request letter, Company 1 was authorized to make a withdrawal from the account in which Performance Incentive Fee funds were set aside.

RE: AMC West Q4 2014 Incentive Management Fee Request

Attached is our AMC West Q4 2014 incentive fee submittal with supporting documents.

Summary of Incentive Fees are as follows:

**Community and Maintenance Management Incentive Fee**
Recommended for Approval: $358,624.00

**Performance for the Development Incentive Fee**
Recommended for Approval: $15,089.99

**Performance for the Renovation Incentive Fee**
Recommended for Approval: $10,204.00

**Total Request**: $383,917.99

*Figure 2*

### CUNEFARE's Role in Submitting False Information to the Air Force

24. CUNEFARE directly supervised military housing community managers, including CC-2, CC-7, and CC-8, who were responsible for overseeing the day-to-day management of the privatized military housing communities at Lackland AFB, Travis AFB, Vandenberg AFB, Tinker AFB, and Fairchild AFB.

25. In addition to other oversight duties, CUNEFARE was responsible for reviewing and approving Quarterly Maintenance Reports prepared by the community managers and their subordinates, and ensuring that the numbers in the Quarterly Maintenance Reports were submitted to the Air Force with the Performance Incentive Fee request letters.

26. Based on his job responsibilities, training, and communications with other employees of Company 1, CUNEFARE knew, and had reason to know, that the Quarterly Maintenance Reports he approved were used to report the Maintenance Performance Objectives to the Air Force, and to obtain the Air Force's authorization for the Performance Incentive Fee each quarter. CUNFARE further understood that meeting Maintenance Performance Objectives

and achieving Performance Incentive Fees were important goals for Company 1, because meeting these goals would allow Company 1 to obtain more money from the Air Force.

27. CUNEFARE admits that he conspired with CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, and CC-10, and others, to manipulate and falsify information in Yardi in multiple quarters between in or around 2013 to in or around 2015 so that Quarterly Maintenance Reports falsely reflected that Company 1 had met Performance Maintenance Objectives, when in truth and in fact, as CUNEFARE and his co-conspirators well knew, it had not. This allowed Company 1, acting through the co-conspirators and others, who were its agents and employees, to submit requests to the Air Force for payment of Performance Incentive Fees to which it was not entitled, and to reap the pecuniary benefits of the scheme.

28. Specifically, in quarters in which Company 1 did not legitimately meet the Maintenance Performance Objectives, CUNEFARE gave written and oral instructions to community managers and others that resulted in the community managers and others manipulating and falsifying information in Yardi so that the Quarterly Maintenance Report would falsely reflect that Company 1 had met the objectives. These actions had the effect of falsely inflating Company 1's Maintenance Performance Objectives.

29. CUNEFARE knowingly and intentionally sent multiple emails, via interstate wire communications, in which he directed CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, and CC-9, and others, to manipulate and falsify information in Yardi. CUNEFARE sent the following emails, among others, in furtherance of the scheme to which he is pleading guilty.

30. On or about October 24, 2013, referring to numbers in a draft Quarterly Maintenance Report, CUNEFARE emailed CC-5, CC-6, CC-7, and CC-8, writing "I'm not sure

what happened to these reports but the response and completion times for all categories need to be above 95%?"

31. On or about October 24, 2013, CUNEFARE emailed CC-5 writing "[CC-5] always make sure we are meeting our incentive fee requirements for all categories of 95% or higher and completion times are lower than goal."

32. On or about October 24, 2013, CUNEFARE, referring to numbers in a draft Quarterly Maintenance Report, emailed CC-5, CC-6, and CC-7 writing "These reports are incorrect. The response times need to be above 95%."

33. On or about January 8, 2014, CUNEFARE emailed CC-3, CC-4, and CC-8, writing "[CC-8] need explanations on the late completions".

34. On or about January 8, 2014, CUNEFARE emailed CC-4, CC-5 and others, writing "[CC-5] why are there so many late completions? The % On Time Completion needs to be above 95% so correct. Also, you need to connect the emergency to get the % On Time Response above 95%."

35. On or about April 2, 2014, CUNEFARE emailed CC-2 and CC-4,, writing "[CC-2] please make the corrections by 4/3. All categories need to be higher than 95% for the response and the completion times need to be less than the goal (except appointments). Also, Appointment completion times look high, so look into that as well."

36. On or about July 22, 2014, CUNEFARE emailed CC-3, CC-4, CC-5, CC-6, and others writing "Fairchild: Routine appointments less than 95%?? Routine completions times are off for routine and appointments are off? Warranty routine need to be exceptions for response and completion. Tinker: Emergency response time should be when we are at the door .03?? Is that

correct? Warranty .00 to respond? Completion time on Emergency warranty .02 does not seem correct.  All times must be achieved and percentages higher than 95%.  Make this a priority."

37. On or about August 18, 2014, CUNEFARE emailed CC-2, writing "[CC-2] please work on the maintenance comment cards to ensure a satisfaction rate of 95%.  As you know, we have to earn our incentive fee."

38. On or about October 22, 2014, CUNEFARE emailed CC-2 and CC-9, writing "Did we clear these up on the response times for emergency and urgent?" CC-2 responded "No Sir. I'm still waiting for CC-10 to update [Yardi]." CUNEFARE responded, "need to wrap it up and ensure that they are over 95%."  That same day, referring to numbers in a draft Quarterly Maintenance Report, CC-2 sent an email to CC-9, the Maintenance Manager at Lackland AFB, writing, in part, "See the attached. The numbers circled in RED need to be 95% or above." CC-9 responded, "So this means we have to go in and change the dates to correct?" CC-2 responded "Yes."

39. On or about March 13, 2015, CUNEFARE emailed CC-5, writing, in part, "[CC-5] please clean this up and let me know by COB so I can re-run. Has to be over 95%. If you have exceptions let me know how many and what the percentage is with the exceptions."

40. On or about April 20, 2015, CUNEFARE emailed CC-2, writing, "Team: please complete your 1Q Maintenance Report today. We need to get this completed and ensure response and completion times are over 95%."  CC-2 sent an email to CC-10 stating, "I know you're really busy, but I'm getting pressure about the Quarterly Maintenance Report and all results being over 95%. Will you please take another look at it and make adjustments to ensure we are at 95% response/completion times in all categories."

41. CUNEFARE admits that, as a result of the emails set forth above, and other personal actions attributable to him, including oral and written instructions that he provided to his

9

subordinates, his subordinates manipulated and falsified information in Yardi in quarters to ensure that they met their Maintenance Performance Objectives, and Company 1 obtained the Performance Incentive Fee.

42. CUNEFARE admits that by directing information to be manipulated in Yardi, CUNEFARE and his co-conspirators knowingly and intentionally caused false information regarding the Maintenance Performance Objectives to be supplied to the Air Force on a quarterly basis, deceiving the Air Force into believing that Company 1 was properly maintaining the housing communities, and enriching Company 1 at the expense of the Air Force, when in fact Company 1 was unable to keep up with maintenance issues at many of the military housing communities that it managed, which allowed parts of the communities to fall into disrepair.

43. CUNEFARE's actions were committed knowingly, willfully, and with the intent to defraud.

44. CUNEFARE's actions were in furtherance of a scheme to obtain money and property from the Air Force by means of false and fraudulent pretenses, representations, and promises, in contracts, loans, and guarantees valued at more than $1,000,000

Respectfully submitted,

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

By: *Michael P. McCarthy*
_____
Michael P. McCarthy, D.C. Bar #1020231
Babasijibomi Moore
Trial Attorneys, Criminal Division, Fraud Section
United States Department of Justice
1400 New York Avenue, N.W.
Bond Building, Fourth Floor
Washington, D.C. 20530

(202) 305-3995 (McCarthy)
(202) 834-2793 (Moore)
Michael.McCarthy2@usdoj.gov
Babasijibomi.Moore@usdoj.gov

11

**DEFENDANT'S ACCEPTANCE**

The preceding Statement of the Offense is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 4/22/2021

Rick CUNEFARE
Defendant

**ATTORNEY'S ACKNOWLEDGMENT**

I have read this Statement of the Offense, and have reviewed it fully with my client. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 4/22/21

Lee Stein, Esq.
Counsel for Rick CUNEFARE